637 So.2d 109 (1994)
STATE of Louisiana
v.
Lester ZIEGLER, et al.
No. 93-KK-3019.
Supreme Court of Louisiana.
May 23, 1994.
*110 Richard P. Ieyoub, Atty. Gen., Harry F. Connick, Dist. Atty., Elizabeth M. Revere, Keith M. Detweiler, Maurice E. Landrieu, Jr., for applicant.
Donald O. Pinkston, Wayne T. Fontenelle, Ernest L. Caulfield, Kevin V. Boshea, for respondents.
MARCUS, Justice.[*]
This case arises from an investigation into a bogus birth certificate emanating from the State's Bureau of Vital Statistics. The investigation resulted in the arrests of defendants, Sherman Clark, a custodian at the State Building, Diana S. Battiste and Cherlyn J. Fletcher, two employees of the Bureau, and Lester Ziegler, the middleman in the scheme. Defendants were charged by bill of information with public bribery.
In March of 1991, Special Agent Stafford Williams of the United States Immigration and Naturalization Service (INS) in New York contacted William Barlow of the Louisiana Bureau of Vital Statistics concerning a Louisiana birth certificate he suspected was bogus. The birth certificate had turned up in New York in the hands of a man from Guyana. It was in the name of Roulston Joseph and had been issued to him in June of 1990. Barlow confirmed that the certificate was fraudulent. After receiving a FAX of the bogus certificate on June 7, 1991, Barlow contacted the state police, who made an effort to coordinate an investigation with INS agents in New York.
The state police investigation stalled. As a result, Barlow believed the police were not actively investigating the case. Since Barlow had already begun an internal investigation, and since the evidence supported the conclusion that the fake certificate was produced from his office, he decided to take administrative action to prevent further misfeasance by Bureau employees. After office hours, on August 9, 1991, Barlow and other Bureau supervisors conducted a general administrative search of the work stations of the Bureau's employees. Since Barlow had concluded the fake certificate was produced from his office, any evidence relating to the forgery was most likely to be found somewhere in those work stations. Approximately forty work stations were searched. Those work stations occupied one half of a floor of a multi-story building. The areas searched were modular work spaces partially enclosed in which there were desks, drawers, and shelves. The furniture in the modules had no locking mechanisms. When Battiste's desk was searched, Barlow and the supervisors *111 found a folder containing: (1) four sheets of the Bureau's official bank note paper[1]; (2) a "SampleHow to Extract Delayed Certificate" information sheet; (3) one pre-signed City of New Orleans, State of Louisiana certificate of marriage packet; (4) three sheets of yellow lined paper marked with the official seal of the Louisiana Department of Health and Human Resources, Office of Vital Records; and (5) four copies of Louisiana Certificates of Live Birth and one copy of a Louisiana Certificate of Death. Battiste was not authorized to have these items. Officer Genny May of the state police contacted Barlow almost one month after the search, at which time the evidence was turned over to the police.
Sherman Clark was arrested on October 22, 1991, at which time he gave a statement to Officer May. He said he had been approached by Lester Ziegler, also known as "Jake." Ziegler wanted a fake birth certificate for Roulston Joseph, and he gave Clark some money to obtain the certificate for him. Clark, checked into it and came up with the name of Diana Battiste. He approached Battiste's friend, Cherlyn Fletcher and asked Fletcher if she could get Battiste to make a fake birth certificate for someone. Fletcher obtained the certificate from Battiste and gave it to Clark.[2] Clark gave it to Ziegler, who sent it to Roulston Joseph.
After Clark gave his statement to Officer May, the police obtained search warrants for the residences of Clark and Battiste. Officers executing the warrant at Battiste's residence found, inside a purse, another fake birth certificate and a sheet of paper containing the information included on the fake certificate.
The trial judge suppressed the evidence seized from Battiste's desk, as well as the confession given by Clark to the state police. The court of appeal granted writs and affirmed the suppression of the evidence seized from Battiste's desk.[3] Upon the state's application, we granted certiorari to review the correctness of that decision.[4]
The sole issue before us is whether the evidence seized from Battiste's desk was properly suppressed.
Government employers and supervisors are subject to the restraints of the Fourth Amendment when they conduct searches and seizures within their employees' work spaces. O'Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).[5] In that case, the Supreme Court rejected a warrant requirement for administrative searches by government employers, stating: "[R]equiring an employer to obtain a warrant whenever the employer wished to enter an employee's office, desk, or file cabinets for a work-related purpose would seriously disrupt the routine conduct of business and would be unduly burdensome." 480 U.S. at 722, 107 S.Ct. at 1500. Similarly, the O'Connor Court concluded that "a probable cause requirement for searches of the type at issue here would impose intolerable burdens on public *112 employers." Id. at 724, 107 S.Ct. at 1501. In rejecting a probable cause requirement, the Supreme Court stated:
In sum, we conclude that the "special needs, beyond the normal need for law enforcement make the ... probable-cause requirement impracticable," [New Jersey v. T.L.O.,] 469 U.S., at 351, 105 S.Ct., at 748 (BLACKMUN, J., concurring in judgment), for legitimate work-related, noninvestigatory intrusions as well as investigations of work-related misconduct.
O'Connor, 480 U.S. at 725, 107 S.Ct. at 1501. The Court went on to hold that "public employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances." Id. at 725-26, 107 S.Ct. at 1501-02.
The O'Connor Court set forth a two pronged analysis for determining whether an employee's Fourth Amendment rights were violated by an administrative search and seizure. First, the employee must have a reasonable expectation of privacy in the area searched, or in the item seized. This expectation of privacy must be one "that society is prepared to consider reasonable." O'Connor, 480 U.S. at 715, 107 S.Ct. at 1496 (quoting United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). Second, if a reasonable expectation of privacy exists, the Fourth Amendment requires that the search be reasonable under all the circumstances. O'Connor, 480 U.S. at 725-26, 107 S.Ct. at 1501-02. "Under this reasonableness standard, both the inception and the scope of the intrusion must be reasonable." Id. at 726, 107 S.Ct. at 1502.
Assuming, without deciding, that Battiste had a reasonable expectation of privacy in her work space, we must examine the reasonableness of the search, both at its inception, and in its scope. The O'Connor Court described the reasonableness test as follows:
Ordinarily, a search of an employee's office by a supervisor will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file.... The search will be permissible in its scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of ... the nature of the [misconduct]."
480 U.S. at 726, 107 S.Ct. at 1502 (brackets in original) (quoting New Jersey v. T.L.O., 469 U.S. 325, 342, 105 S.Ct. 733, 743, 83 L.Ed.2d 720 (1985)). Because the hospital officials in O'Connor had an "individualized suspicion" of misconduct by Dr. Ortega, the Court stated that it "need not decide whether individualized suspicion is an essential element of the standard of reasonableness that we adopt today." Id. In our case, individualized suspicion was not present, thus, we must address the issue not decided by the Supreme Court in O'Connor.
Although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure," New Jersey v. T.L.O., 469 U.S. at 342, n. 8, 105 S.Ct. at 743, n. 8 (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 560-561, 96 S.Ct. 3074, 3084-3085, 49 L.Ed.2d 1116 (1976)), in Skinner v. Railway Labor Executives Association, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (a case allowing drug and alcohol testing of government employees absent individualized suspicion), the Court stated:
[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable. In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.
Id. at 624, 109 S.Ct. at 1417 (citation omitted).
*113 The fake certificate was used by a national of Guyana to acquire a passport from the United States. Thus, birth certificates have wide ranging impact on the effectiveness of the federal government to control its borders and exclude classes of people and individuals ineligible for immigration, permanent status, or even travel visas, as in the case of a terrorist. The question remaining, therefore, is whether the governmental interest in preventing the issuance of fraudulent birth certificates justified the privacy intrusion.
Any expectation of privacy Battiste may have had in her work space was minimal due to office practices and the physical layout of the office.[6] Supervisors had access to all of the work spaces so they could respond to client requests and work with clients, specifically when the employee who occupied the work space was not there. Barlow testified that he considered it his prerogative to look at as many desks as he wished at any time. He also testified that it was normal for him to go into work spaces to retrieve materials for a case and that supervisors, likewise are comfortable or should be comfortable entering the work stations to procure what they need to complete a transaction. Also, the work spaces are not enclosed and there are no locking mechanisms on the state-supplied furniture. Furthermore, the search was conducted after hours.
Accordingly, we consider that the search of Battiste's desk may have been reasonable despite the absence of individualized suspicion, provided it was "justified at its inception" and "permissible in its scope."
Clearly, there were reasonable grounds to conclude that the search would reveal the source of employee misconduct. Once Barlow confirmed the lack of authenticity of the birth certificate, he had good reason to suspect that one or more of his employees were issuing fake birth certificates, and that a search of their work stations would turn up evidence of work-related misconduct. Absent some sort of disciplinary action, the integrity of the Bureau would have been jeopardized. Furthermore, given the quality of the fraudulent birth certificates (issued on bank paper), Barlow's concern that other fraudulent certificates were being issued from his office was based on more than reasonable grounds. Because the certificate turned up in the hands of an illegal alien in New York and was issued from his office, Barlow had good reason to conclude that the incident was not an isolated one and that evidence of the employee misfeasance would be found in his office. Hence, we find that the search was justified at its inception.
The search was permissible in its scope because Barlow searched only those work spaces within his office and from which the fraudulent birth certificates could have come. Barlow testified that employees occupy relatively small spaces which are not closed off to other employees. These cubicles contain state-issued furniture, none of which have locks to secure the contents of desks and cabinets. The search itself took place after hours, when it is reasonable to conclude that employees would have removed from the office personal items only temporarily in the office. The evidence does not show that any personal containers, such as purses or briefcases, were searched, and the search was confined to government-supplied desks and work areas. Barlow only had approximately forty employees, all of whom became suspects due to their access to certain documents. Those employees occupied one half of a floor of a multi-story building. Thus, the suspects were easily narrowed to those working for a particular department, under particular supervisors.
We conclude that the search of Battiste's desk was reasonable despite the absence of individualized suspicion. The courts below erred in suppressing the evidence seized from Battiste's desk. We must reverse.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed insofar as it suppressed the evidence seized from Battiste's *114 desk. The case is remanded to the district court for further proceedings.
WATSON, J., concurs believing there was no privacy interest.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Lemmon, J. was not on the panel which heard and decided this case. Charles A. Marvin, Chief Judge, Court of Appeal, Second Circuit, sitting in place of Justice James L. Dennis.
[1] "Bank paper" is a special type of paper. Barlow testified that when information is transferred to bank paper, the paper becomes a certified document issued from the Office of Vital Statistics. A bogus birth record prepared on this paper would be acceptable anywhere in the country. The quality of the paper would make it indistinguishable from an authentic birth record.
[2] The amount of money that Ziegler gave to Clark is unclear. Clark's statement indicates that forty dollars was given by him to Fletcher, who gave the money to Battiste. Clark said he retained twenty dollars for himself.
[3] The court of appeal reversed the suppression of Clark's statement, but Clark did not apply to this court for writs.
[4] 633 So.2d 159 (La.1994).
[5] The record before this court does not demonstrate that Barlow was acting as an agent of any investigative branch of government involved in criminal detection and prosecution. Although the state police were trying to coordinate an investigation with the INS, Barlow testified that it "never developed and things kind of snagged, rolling to a halt." Since Barlow was concerned that additional bogus documents might be issuing from his office, and since he had begun his own internal investigation, he decided to use an administrative search to aid his investigation. There were no law enforcement officers present at the time of the search, and Barlow did not receive instructions from any law enforcement personnel concerning the search. It was only after Officer May contacted Barlow almost a month after the search, that the evidence was turned over to police.
[6] As previously noted, we assume without deciding that Battiste had a reasonable expectation of privacy in her work space.