687 So.2d 1013 (1996)
Robert VARNADO, Jr., and Edgar K. Corey
v.
DEPARTMENT OF EMPLOYMENT AND TRAINING, OFFICE OF WORKERS' COMPENSATION, State of Louisiana.
No. 95 CA 0787.
Court of Appeal of Louisiana, First Circuit.
June 28, 1996.
Order Granting Rehearing in Part and Denying Rehearing in Part December 30, 1996.
Writ Denied March 27, 1997.
*1019 J. Arthur Smith, III, Baton Rouge, for Plaintiffs/Appellees, Robert Varnado, Jr. and Brenda Allen.
Daniel K. Rester, Baton Rouge, John S. Coulter and L'Reece D. Levine, Baton Rouge, for Defendant/Appellant, Department of Labor, Formerly the Department of Employment and Training, Office of Worker's Compensation, State of Louisiana.
Dele Adebamiji, Baton Rouge, for Defendant/Appellant, Billy Walsh, et al.
Before CARTER and PITCHER, JJ., and KLINE[1], J. Pro Tem.
CARTER, Judge.
This is an appeal from a trial court judgment in an action for damages under 42 U.S.C. § 1983.

FACTS
In 1990, Robert Varnado, Jr., was appointed as an administrative hearing officer for District 6 of the State of Louisiana, Department of Employment and Training, Office of Workers' Compensation (Workers' Compensation Office). Brenda Allen was Varnado's secretary.
Initially, the Workers' Compensation Office for District 6 was located in Varnado's private legal office in Franklinton, Louisiana. Moreover, Varnado used his personal equipment in the exercise of his duties as a workers' compensation hearing officer. Thereafter, District 6 acquired its own offices and equipment from which Varnado carried out his duties as a hearing officer. In addition to his duties as a hearing officer, Varnado performed work for the district attorney's office and maintained a private legal practice.
Prior to 1992, Alvin J. Walsh served as statewide claims manager for the Workers' Compensation Office. In January, 1992, Walsh was appointed as Assistant Secretary of the Labor Department and Director of the Workers' Compensation Office. Sometime thereafter, Walsh informed the hearing officers that they must cease any private practice of law during regular office hours and that state personnel and equipment should not be used for any purpose not related to state business.
On November 17, 1992, Walsh and Nancy Griswold, chief administrative hearing officer for the Workers' Compensation Office, sent a letter to all hearing officers, advising them that hearing officers would not be permitted to maintain an outside legal practice while in state service. The hearing officers were further advised that all ongoing private legal matters should be concluded or referred to other counsel by December 15, 1992. The letter also warned the hearing officers that state civil service employees and state equipment could not be used in their outside practices.
On November 30, 1992, Varnado, Allen, Edgar K. Corey (another hearing officer), *1020 and Corey's secretary were notified of a meeting to be held in Baton Rouge on the following day. Present at the December 1, 1992, meeting, were Gayle Truly, Secretary of the Department of Labor, Walsh, Griswold, and human resource personnel, Kathleen Kennedy and Trella Bennett. At the meeting, Walsh advised Varnado, Allen, and Corey of the proper procedure for filing a grievance regarding the prohibition against the private practice of law by hearing officers.
On December 14, 1992, Robert Varnado, Jr., and Edgar K. Corey filed an action for declaratory judgment and injunctive relief in the 19th Judicial District Court against the Workers' Compensation Office. In their petition, Varnado and Cory alleged that, although they are prohibited by LSA-R.S. 23:1310.1B from practicing workers' compensation law while employed as a hearing officer, there is no statutory requirement that they cease all outside practice of law. Varnado and Corey requested that the court issue a temporary restraining order, and an injunction thereafter, prohibiting the Workers' Compensation Office from discharging them because of their outside legal practices and for declaratory relief, entitling them to maintain an outside legal practice that does not include workers' compensation law.
On that date, the trial judge issued a temporary restraining order to the Workers' Compensation Office, prohibiting them from discharging Varnado and Corey for continuation of their outside legal practices, which do not involve workers' compensation law.[2] A copy of the temporary restraining order was hand-delivered to Walsh on December 15, 1992.
On December 16, 1992, Walsh directed "audits" of the offices of Varnado and Corey. On the morning of December 17, 1992, Walsh assembled his audit teams and dispatched them with instructions to look at every file in the offices and to download all computer information onto diskettes. Pursuant to these instructions, the audit teams presented themselves at Varnado's office (as well as at Corey's office) and searched the desks, file cabinets, credenzas, and other furniture located on the premises and retrieved information from the computers located in the offices. The audit teams reported the presence of private client files in the offices and the presence of non-workers' compensation material on the computers. On February 2, 1993, Varnado and Allen were discharged based on the results of the December 17, 1992, search.[3]
Thereafter, on March 3, 1993, Varnado amended his petition, adding Brenda Allen as a party plaintiff and naming Alvin J. Walsh as an additional defendant. The plaintiffs also alleged that the searches of their offices were unconstitutional under the federal and state constitutions and that, as such, the Workers' Compensation Office and Walsh were liable to them for damages under 42 U.S.C. § 1983. Varnado and Allen also alleged that they had been discharged based upon the fruits of the unconstitutional searches. The amended petition also alleged that the unconstitutional searches were conducted in retaliation for Varnado's exercise of his constitutional right of access to the courts. Accordingly, the plaintiffs requested compensatory damages for mental anguish, humiliation, and damage to reputation, punitive damages pursuant to 42 U.S.C. § 1983, and attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988. Varnado and Allen amended their petition again on January 18, 1994, to amend their damage claim to include lost wages.
The Workers' Compensation Office and Walsh filed an exception pleading the objection of no cause of action. In their exception, the Workers' Compensation Office and Walsh alleged that they could not be prohibited from using the evidence obtained at the audit in any civil proceeding, that plaintiffs had no cause of action for compensatory damages, punitive damages, and/or attorney's fees, and that plaintiffs did not have an action against the Workers' Compensation Office. Walsh *1021 also filed a motion for summary judgment, alleging that he is entitled to qualified immunity from all claims under 42 U.S.C. § 1983 and under the state constitution. After a hearing, the trial court, by judgment, dated May 21, 1993, denied defendants' exception pleading the objection of no cause of action and the motion for summary judgment.[4]
After a hearing on the merits, the trial court determined that the plaintiffs had a reasonable expectation of privacy in their offices and that the search of those offices authorized by Walsh was unreasonable at its inception. The trial court further determined that Walsh's actions were specifically designed as retaliation for the filing of the lawsuit. The trial court also determined that Walsh was not entitled to qualified immunity. However, the trial court refused to reinstate Varnado and Allen, citing Moore v. Board of Supervisors of Louisiana State University and Mechanical College, 559 So.2d 548 (La. App. 2nd Cir.1990). The trial court determined that Varnado and Allen were entitled to compensatory damages, attorney's fees, and litigation expenses, but refused to award punitive damages. Accordingly, the trial court rendered judgment in favor of Varnado and against the Workers' Compensation Office and Walsh for $90,000.00, together with legal interest from date of judicial demand until paid. Judgment was also rendered in favor of Allen and against the Workers' Compensation Office and Walsh for $60,000.00, together with legal interest from date of judicial demand until paid. Plaintiffs were also awarded attorney's fees in the amount of $56,552.00 and litigation expenses in the amount of $7,678.03. Plaintiffs' claims for punitive damages were dismissed, with prejudice, and plaintiffs' claims for reinstatement and back pay were dismissed, without prejudice to their rights to seek this relief before the Louisiana Civil Service Commission. The judgment was signed on November 15, 1994. The Workers' Compensation Office and Walsh were cast with all costs.
From this adverse judgment, the Workers' Compensation Office and Walsh filed a petition for a suspensive appeal,[5] assigning the following errors:
1. The trial court erred in holding that Varnado's and Allen's Fourth Amendment constitutional rights were violated.
2. The trial court erred in holding that Varnado's and Allen's First Amendment rights of access to the courts were violated.
3. The trial court erred in holding that Walsh was not entitled to qualified immunity.
4. The trial court erred in awarding compensatory damages, attorney's fees, and litigation expenses to Varnado and Allen.
5. The trial court erred in holding the Workers' Compensation Office liable.
Varnado and Allen answered the appeal, assigning as error the trial court's failure to assess punitive damages against Walsh, failure to award sufficient compensatory damages to Varnado, failure to reinstate Varnado and Allen, and failure to award Varnado and Allen back pay. Varnado and Allen also *1022 requested additional attorney's fees and litigation expenses on appeal.

FEDERAL LAW CLAIMS UNDER § 1983
A civil remedy for violation of a person's constitutional rights is provided for in 42 U.S.C. § 1983, which imposes liability only upon one:
who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and laws....
See Touchton v. Kroger Company, 512 So.2d 520, 526 (La.App. 3rd Cir.1987). In other words, 42 U.S.C. § 1983 imposes liability for violation of rights protected by the United States Constitution, not for violations of duties of care arising out of tort law. Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); Ross v. Sheriff of Lafourche Parish, 479 So.2d 506, 512 (La.App. 1st Cir.1985).
In order to prevail in a civil rights action under § 1983, the plaintiffs must prove by a preponderance of the evidence that the conduct of the defendants was under the color of state law and that the conduct resulted in a deprivation of rights, privileges, and immunities secured by the United States Constitution or a federal statute, or both. Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); Johnson v. Morel, 876 F.2d 477 (5th Cir.1989); Moresi v. State, Department of Wildlife and Fisheries, 567 So.2d 1081, 1084 (La.1990); Kyle v. Civil Service Commission, 588 So.2d 1154, 1159 (La.App. 1st Cir.1991), writ denied, 595 So.2d 654 (La.1992). Often implicit in the first component, and always related to the second, is the requirement of "state action." Frazier v. Board of Trustees of Northwest Mississippi Regional Medical Center, 765 F.2d 1278, 1283 (5th Cir.1985), amended, 777 F.2d 329 (5th Cir.1985), cert. denied, 476 U.S. 1142, 106 S.Ct. 2252, 90 L.Ed.2d 697 (1986). Most constitutional rights are secured from infringement by governments, not private parties. Jackson v. Metropolitan Edison Company, 419 U.S. 345, 349, 95 S.Ct. 449, 452, 42 L.Ed.2d 477 (1974); Frazier v. Board of Trustees of Northwest Mississippi Regional Medical Center, 765 F.2d at 1283. In other words, § 1983 applies to persons who both deprive others of a right secured by the Constitution or the laws of the United States and act under color of state law.

1. Conduct of defendants was under color of state law.
An action for civil rights violations does not extend to all controversies between individual citizens. District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). It deals only with those deprivations of rights which are accomplished under color of the law of any state or territory and is limited to protecting against acts which are done under color of some state or territorial law or ordinance. Moreover, the term "color of state law" is synonymous with "state action." Further, with respect to the liability of a particular defendant, the Supreme Court stated that "a public official is liable under § 1983 only `if he causes the plaintiff to be subjected to deprivation of his constitutional rights'." Baker v. McCollan, 443 U.S. at 142, 99 S.Ct. at 2693.
However, the law is clear that a state is not a person within the meaning of § 1983. Will v. Michigan Department of State Police, 491 U.S. 58, 70-72, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). State and arms of state government are not persons who may be sued under this section. Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); Board of Examiners of Certified Shorthand Reporters v. Neyrey, 542 So.2d 56, 66 (La.App. 4th Cir.), writ denied, 548 So.2d 1231 (La.1989). LSA-R.S. 13:5102 defines state agencies as any board, commission, department, agency, special district, authority, or other entity of the state.
In the instant case, the Workers' Compensation Office is an agency of the state within the contemplation of LSA-R.S. 13:5102. As such, the Workers' Compensation Office cannot be held liable for § 1983 damages, and the trial court erred in holding *1023 the Workers' Compensation Office liable for damages under 42 U.S.C. § 1983.
With regard to defendant, Walsh, he is either a public official or is an employee of a state agency. At all times pertinent hereto, Walsh was acting in his capacity as the director of the Workers' Compensation Office. As such, the "state action" requirement is met.

2. Conduct resulted in a deprivation of rights.
The second requirement of an action brought under § 1983 "is whether the plaintiff has been deprived of a right `secured by the Constitution and laws.'" Baker v. McCollan, 443 U.S. at 140, 99 S.Ct. at 2692.

a. Fourth Amendment Violations.
The Fourth Amendment states:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....
As the Supreme Court recently reiterated in Winston v. Lee, 470 U.S. 753, 758-760, 105 S.Ct. 1611, 1615-16, 84 L.Ed.2d 662 (1985), "the overriding function of the Fourth Amendment is to protect personal privacy and dignity against an unwarranted intrusion by the State." The values of individual privacy and dignity are "basic to a free society," and the fourth amendment protects these values by recognizing the "individual's legitimate expectations that in certain places and at certain times he has the right to be let alonethe most comprehensive of rights and the right most valued by civilized men."
The amendment explicitly protects against two different types of governmental invasion: searches and seizures. A search occurs when the government infringes "an expectation of privacy that society is prepared to consider reasonable." United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); National Treasury Employees Union v. Raab, 816 F.2d 170, 175 (5th Cir.1987). On the other hand, a seizure of a person occurs when the government meaningfully interferes with his liberty, and seizure of property occurs when the government meaningfully interferes with an individual's possessory interests in property. United States v. Jacobsen, 466 U.S. at 113, 104 S.Ct. at 1656; National Treasury Employees Union v. Raab, 816 F.2d at 175.
However, not all invasions of privacy or interferences with liberty or property are searches or seizures. Before the infringement can be labeled either "search" or "seizure," in the sense in which those words are used in the fourth amendment, the government action must be unreasonable or constitute a meaningful interference. National Treasury Employees Union v. Raab, 816 F.2d at 175. These criteria are implied from the very use of the terms, "search" and "seizure." In addition, by its express text, the amendment prohibits only those searches and seizures that are unreasonable in the particular circumstances in which they are performed. National Treasury Employees Union v. Raab, 816 F.2d at 175.
Government employers and supervisors are subject to the restraints of the Fourth Amendment when they conduct searches and seizures within their employees' work spaces. O'Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987); State v. Ziegler, 93-3019 (La. 5/23/94); 637 So.2d 109, 111. In O'Connor v. Ortega, the U.S. Supreme Court stated that "public employer intrusions on the constitutionally protected privacy interests of government employees for non-investigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances." 480 U.S. at 726, 107 S.Ct. at 1502.
The O'Connor Court set forth a two-pronged analysis for determining whether an employee's Fourth Amendment rights were violated by an administrative search and seizure. First, the employee must have a reasonable expectation of privacy in the area searched or in the item seized. This expectation of privacy must be one that "society is prepared to consider reasonable." O'Connor v. Ortega, 480 U.S. at 715, 107 S.Ct. at 1496; State v. Ziegler, 637 So.2d at 112. Second, if a reasonable expectation of *1024 privacy exists, the Fourth Amendment requires that the search be reasonable under all the circumstances. O'Connor v. Ortega, 480 U.S. at 726, 107 S.Ct. at 1502; State v. Ziegler, 637 So.2d at 112. Under this reasonableness standard, both the inception and the scope of the intrusion must be reasonable. O'Connor v. Ortega, 480 U.S. at 726, 107 S.Ct. at 1502; State v. Ziegler, 637 So.2d at 112.

1. Reasonable Expectation of Privacy.
Because the reasonableness of an expectation of privacy is understood to differ according to context, it is essential to first delineate the boundaries of the workplace context. The workplace includes those areas and items that are related to work and are generally within the employer's control. O'Connor v. Ortega, 480 U.S. at 715, 107 S.Ct. at 1496-97.
In O'Connor v. Ortega, 480 U.S. at 715-16, 107 S.Ct. at 1497, the Court noted that, at a hospital, the hallways, cafeteria, offices, desks, and file cabinets, among other areas, are all part of the workplace, which remain part of the workplace context even if the employee has personal items in them. In an office, like in a hospital, the hallways, cafeteria, offices, desks, and file cabinets, among other areas, are all part of the workplace, which remain part of the workplace context even if the employee has personal items in them. Moreover, an employee's expectations of privacy in his office, desk, or filing cabinet may be reduced by the actual office practice and procedures or by legitimate regulation. O'Connor v. Ortega, 480 U.S. at 717, 107 S.Ct. at 1497.
In the instant case, the trial court determined that Varnado and Allen had a reasonable expectation of privacy in their offices. As pointed out by the trial judge, these offices are not generally open to public scrutiny. Moreover, executive office arrangements are considered private by most members of society. The evidence presented at the trial supports this conclusion.
Varnado testified that he and Allen shared an office at the District 6 Office. The computer in the office was the one on which Allen performed her work. Two doors lead into Varnado's chambers, both of which have locking mechanisms, which he sometimes used. Varnado testified that his desk also had a locking mechanism, which he sometimes used. In addition to his desk, Varnado had a credenza in his office. Allen was the only person, other than Varnado, who had free access to the office.
Varnado noted that the state computer located in his office also stored items related to his private practice. Varnado explained that the Workers' Compensation Office used his private office and equipment when the office first opened. When the Workers' Compensation Office finally acquired its own computers, a state worker off-loaded all of the files from his personal computer onto the state equipment. Varnado also testified that he had private legal files in his office and that any private client files were located in the lower left-hand drawer of his desk, on the top of the desk, on the floor of his office, or on the credenza.
His personal records, including check books, bills, real estate and insurance papers, and other documents were also located in his desk. Moreover, Varnado had business cards in a holder on his desk. He acknowledged that the telephone number listed on his business cards was the District 6 Office number, which had been his private law office telephone number. Varnado testified that he relinquished the telephone number to the state a few months earlier.
Varnado testified that confidential client communications, like title opinion letters, succession documents, wills, powers of attorney, were removed from the computer as well as from his desk and credenza.
Allen explained that she and Varnado shared office space and that she utilized the computer in his office. Initially, Allen used Varnado's personal computer equipment for her workers' compensation work. Thereafter, when the Workers' Compensation Office acquired its own equipment, someone from the state retrieved all of the files from Varnado's personal computer and loaded them onto the state's equipment.
*1025 According to Allen, her desk was searched on the same day as the search of Varnado's office was conducted. Allen admitted that Varnado had the state telephone number and address on his private practice stationary and business cards.
Allen testified that Varnado did not keep state files in his office, if he knew he would not be at the office. She explained that he did this so that, if the files were needed in his absence, those files would be available. Moreover, Allen stated that Varnado did not keep state files in the drawers of his desk or filing cabinets; however, state files were often left on the top of the desk and credenza.
Melissa Barber, a legal secretary with the Workers' Compensation Office during Varnado's tenure, testified that she did not have authority to enter Varnado's desk.
The record does not reveal the extent to which the Workers' Compensation Office staff may have had to enter Varnado's and Allen's office, however, we recognize that the evidence supports that Varnado and Allen had a reasonable expectation of privacy in their desks and filing cabinets. Although Varnado and Allen shared office space, they did not share such office space with any other employees. Varnado had occupied that particular office for some time, and he kept various material in his office, which included personal files, files of clients unrelated to the Workers' Compensation Office, personal financial records, and other items. Workers' Compensation Office files were not kept in Varnado's office during periods when he was not at the office, which obviated any administrative need Workers' Compensation Office staff would have had to access Varnado's office.
Based on the above, we find that the trial court correctly determined that Varnado and Allen had a reasonable expectation of privacy in their office, desks, and filing cabinets.

2. Reasonableness of Search.
Having determined that Varnado and Allen had a reasonable expectation of privacy, we must determine whether the search was reasonable.
A determination of the standard of reasonableness applicable to a particular class of searches requires balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). In the case of searches conducted by a public employer, the invasion of the employee's legitimate expectations of privacy must be balanced against the government's need for supervision, control, and efficient operation of the workplace. O'Connor v. Ortega, 480 U.S. at 719-20, 107 S.Ct. at 1499.
The Court, in O'Connor v. Ortega, 480 U.S. at 725-26, 107 S.Ct. at 1502, described the reasonableness test as follows:
[P]ublic employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances. Under this reasonableness standard, both the inception and the scope of the intrusion must be reasonable:
Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the ... action was justified at its inception;" second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place."
Ordinarily, a search of an employee's office by a supervisor will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a file.... The search will be permissible in its scope when "the measures adopted are reasonably related to the objectives of the search and not excessively *1026 intrusive in light of ... the nature of the [misconduct]." (citations omitted)
See State v. Ziegler, 637 So.2d at 112.
Moreover, in New Jersey v. T.L.O., 469 U.S. 325, 342, n. 8, 105 S.Ct. 733, 743, n. 8, 83 L.Ed.2d 720 (1985), the Court held that "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure." However, the court noted, in Skinner v. Railway Labor Executives' Association, 489 U.S. 602, 624, 109 S.Ct. 1402, 1417, 103 L.Ed.2d 639 (1989):
[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed to be unreasonable. In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion. (citations omitted.)
In the instant case, Steven W. Cavanaugh, the director of the Workers' Compensation Office, testified that he held the position prior to Walsh. In fact, Cavanaugh hired Varnado as a hearing officer. Initially, hearing officers were permitted to work in the Baton Rouge office, which was supplied by the state, or they could use their own personal offices. Varnado chose to utilize his own office and furnished his own equipment and supplies. He even used his own secretary. Later, the state supplied Varnado with equipment.
With regard to his policy regarding the practice of law by hearing officers, Cavanaugh testified that he anticipated that hearing officers would begin to wind down their private practices after they were hired. He acknowledged that he signed a document which permitted Varnado to continue his outside practice, with the intention that Varnado would wind down his practice. However, Cavanaugh admitted that he had authorized Varnado to perform part-time work, in addition to his job as a hearing officer, as long as the part-time position did not interfere with his function as a hearing officer. Cavanaugh obtained a list of current cases from Varnado. In addition, Cavanaugh was aware of Varnado's responsibilities with the district attorney's office. Allen had also been given approval to work on a "part-time basis."
Cavanaugh stated that he was unaware of any policy with regard to the personal usage of state computers. He had not discussed the matter with Varnado, nor had he ever sent Varnado any written communication relative to this matter.
Alvin J. Walsh, who had been employed by the Workers' Compensation Office since 1983, was appointed to serve as Assistant Secretary of the Labor Department and Director of the Workers' Compensation Office on January 13, 1992. As director, Walsh is responsible for managing the entire statewide workers' compensation system. Walsh testified that, upon his appointment, he met with the hearing officers and advised them of the administrative policy against the practice law. In fact, Walsh stated that he communicated this message many times. Walsh noted that he had the impression that Varnado and Corey were not happy with the position he had taken.
Then, in a November 17, 1992, memorandum, Walsh established a deadline for the cessation of all outside legal practices. Walsh testified that he did so because he felt strongly about the policy prohibiting such activity. In response to this memorandum, on November 23, 1992, Varnado and Corey sent a reply memorandum to Walsh and Griswold, advising that state law, and particularly LSA-R.S. 23:1310.1B, only prohibited workers' compensation hearing officers from practicing workers' compensation law. Varnado and Corey requested the agency to review the rule, pursuant to LSA-R.S. 49:963, prior to the institution of a suit for declaratory judgment and that the enforcement of the rule be delayed until such ruling by the court.
On December 1, 1992, Walsh requested that Varnado, Allen, Corey, and Corey's secretary attend a meeting, along with other labor department officials. Walsh admitted that no other hearing officers were notified of this meeting. The purpose of the meeting was to impress upon those four people not to *1027 perform outside work on state time or use state equipment.
Thereafter, on December 15, 1992, Walsh received a temporary restraining order.[6] On that same day, Walsh requested that Griswold prepare the audit authorization form. On December 16, 1992, Walsh signed the memorandum. At 8:00 a.m. on December 17, 1992, Walsh met with the audit team. Walsh testified that he had been contemplating audits from January, 1992, until he moved forward in December, 1992, with the audits of Varnado and Corey. During the interim, Walsh spoke with the chief hearing officer, Nancy Griswold, the human resource personnel, Trella Bennett, Rick Glaze, and Kathleen Kennedy, and civil service director, Herbert Sumrall, about the audits. Walsh testified that he was prompted to perform the audits because of the attitude of the hearing officers at the meetings and as a result of the November 17, 1992, memorandum. In his deposition testimony, Walsh admitted that, prior to December 17, 1992, he had no information about Varnado's or Allen's use of state equipment or state personnel. However, Walsh noted that he was not upset by the action taken by Varnado and Corey because one has the right to legal recourse.
According to Walsh, the audit was pre-planned, and he had discussed the matter with the secretary of labor several weeks before the audit. Walsh noted that the audit teams had been formed since November, 1992, but he acknowledged that the members of the audit team did not know about the formation of the teams or the plans for the search prior to December 17, 1992. Walsh acknowledged that he is the person who instructed the teams relative to the search of the office. Walsh advised the team members to look at every file in the office and to download onto diskettes everything on the computers or found there. Walsh noted that he further instructed the audit team members not to look inside any private files. Moreover, Walsh advised the audit team that, upon their return, memoranda should be drafted relative to the procedure for and results of the audit.
According to Walsh, Adrienne Dupont, his chief staff attorney, cautioned him regarding the confidentiality of any private files which may be found in the state offices, which was the first negative comment he received concerning the audit. He stated that legal counsel did not ever raise any issue regarding the legality of the audits themselves.
Walsh acknowledged that there is no written procedure for determining whether a search is justified. He further acknowledged that he was not advised by anyone that he could not do what he did. In fact, Walsh testified that Herbert Sumrall advised him that he would be responsible if wrongdoing was going on, and he failed to respond. Walsh testified that he had reasonable suspicion and that he acted on that suspicion. Moreover, he felt that he could authorize a search for any reason. Nor did he consider any other way to obtain the information he desired.
Walsh testified that Varnado's docket moved well and that his decisions were made timely. In fact, Walsh stated that there was no difference between Varnado's performance and that of the other hearing officers.
Walsh admitted that Varnado and Allen were not terminated until after the search and that the terminations were based on the results of the audits. Walsh also admitted that he contacted the unemployment office regarding Varnado's and Allen's unemployment claims and the Attorney General's Office to have Varnado criminally prosecuted.
In a memorandum, on February 12, 1993, Walsh advised Workers' Compensation Office employees that the conducting of personal business and personal use of computers would not be tolerated. However, Walsh admitted that, on May 14, 1994, he was cited by the Louisiana Inspector General for improperly using state equipment for personal purposes. Walsh explained that the citation involved a state automobile and a claim for reimbursement for mileage. Walsh's usage totaled approximately $600.00.
Nancy Griswold, the chief workers' compensation hearing officer, testified that she *1028 functions primarily in a supervisory and administrative capacity. As such, Griswold was responsible for reviewing docket activity reports and time sheets, scheduling conferences, and maintaining statistics on case and docket flow.
Griswold admitted that, in 1992, Varnado's statistics compared well to that of the other hearing officers in that his performance was as good or better than the statewide average. Griswold acknowledged that she and Walsh had strong feelings about the prohibition against the practice of law by hearing officers. Griswold was present at the December 1, 1992, meeting at which Walsh discussed with Varnado and Corey the prohibition against the practice of law. The meeting also addressed personnel policy with regard to the use of state equipment for personal purposes.
Griswold testified that she and Walsh discussed the temporary restraining order Walsh received on December 15, 1992. Griswold recalled that, on the day following receipt of the temporary restraining order, Walsh requested that Griswold prepare the authorization forms to dispatch the audit team. This was the first occasion for Griswold to learn of the audits. Then, on the morning of December 17, 1992, Walsh discussed the instructions to be given to the audit teams. She or Adrienne Dupont raised the issue of the privacy of any client files which may be found, and Walsh advised the team members not to look into any private file. According to Griswold, the audit teams were dispatched to the District 6 office in Franklinton.
Griswold testified that the audit team was not organized until after receipt of the restraining order. Griswold was also advised not to give advance notice about the audits. According to Griswold, the search lasted approximately one and one-half hours. Griswold was told not to invade the privacy of any client files or to thumb through the pages of any private files. With regard to the computer issue, given that the equipment was state property, the position taken was that any privacy rights were waived with regard to any file on the state computer.
Griswold testified that, in executing the audit, she and fellow audit team member Ramon Biggio opened filing cabinet drawers and the credenza drawers and sliding doors in Varnado's office and inspected the contents. They also looked in the bookcase. The audit team also examined the contents of Allen's desk. Griswold admitted that an item of personal furniture had also been searched. The audit team discovered title examination letters, personal client files, a district attorney's calendar, and a checkbook.
Herbert L. Sumrall, director of the Department of Civil Service, testified that workers' compensation hearing officer positions are classified positions. According to Sumrall, Walsh had expressed concerns about hearing officers' practicing law. Walsh advised Sumrall that he had suspicions that hearing officers were practicing law and that "he needed to go and make a determination as to whether or not it was factual." Sumrall's response was that it was Walsh's duty and responsibility to ensure that state resources were not being used for private purposes.
Robert Warren Dupre, the deputy secretary for the labor department, testified that, in December, 1992, he was the employment service director. Although Dupre could not remember the time-frame, he recalled discussing the audits with Walsh. Dupre testified that he authorized Walsh to conduct the audits.
Adrienne Dupont, chief counsel for the Workers' Compensation Office, testified that, on the afternoon prior to the audits, Griswold requested that she report to Walsh's office in the morning. Griswold explained that they would be conducting audits and that Dupont was a member of one of the audit teams.
On the morning of the audit, Walsh handed Dupont and the other audit team members a memorandum explaining the audits to be conducted. Walsh advised them that they "were looking for evidence of use of state property for private purposes, files, file cabinets, telephone lines, ... personal letterhead, stationary [sic] on desks, that kind of thing." Dupont stated that she expressed concern about going through legal files and suggested that the audits should be conducted in the *1029 least intrusive manner. Dupont initially was reticent about the audits, noting that her "gut" feeling was that there would be no evidence of private practice on state property. Moreover, Dupont recalled telling Walsh that he could not possibly believe that they were going to find anything as a result of the audits and expressed her surprise when the audits revealed evidence of alleged use of state property.
In response to inquiries as to whether the audits were in retaliation for Varnado and Corey having instituted legal proceedings, Dupont explained as follows. Dupont did not participate in the audit of Varnado's office, but she was part of the team for the audit of Corey's office. When Dupont arrived for the audit and handed Corey the memorandum, Corey inquired as to what it was all about. According to Dupont's deposition testimony, she retorted "I think this is what you call an end run." Dupont explained that Walsh did not want the hearing officers practicing law and that the audit to determine the use of state property or state time was one avenue to reach this end. Accordingly, Dupont stated that this expression meant that "he [Walsh] is going to have his intent enforced one way or the other."
Trella Bennett, human resource director, testified that Walsh had discussed with her his concerns about the private practice during state time, on the state premises, and with state property. In fact, she encouraged Walsh to investigate the matter. Bennett was present at the December 1, 1992, meeting Walsh had with Varnado and Allen to discuss Varnado's private practice and its interference with the job.
Kathleen Kennedy, a human resource manager with the labor department, testified that she conducts classification reviews. Kennedy had discussions with Walsh about standardization of the hearing officer system, and she encouraged him to conduct audits to facilitate this process.
Gayle Truly, Secretary of the Department of Labor, testified that she was appointed to that position in January, 1992. Truly attended a meeting that involved Varnado, Allen, and Corey, among others, concerning the practice of law by hearing officers. The meeting was held on December 1, 1992.
In preparation for the audits which Walsh conducted in mid-December, 1992, Truly signed the memorandum. Truly testified that, a week prior to that, Walsh advised her that he was suspicious that private practice files were on the state computer. At the time she signed the memorandum, she and Walsh did not discuss the matter to any extent, and Truly knew that legal proceedings had been instituted by Varnado and Corey against the Workers' Compensation Office. Truly testified that Walsh was somewhat surprised at the lawsuit in that he believed that the issues had been discussed among the various parties sufficiently.
In regard to the justification for the audits, Truly stated that she suspected that Varnado was engaged in private practice during working hours. Truly based these suspicions on her conversation with a Franklinton attorney who mentioned that Varnado was engaged in private practice during working hours. Walsh had allegedly spoken with Rachel Bertrand, a computer person with the department, who had found some files on the state computer. In addition, Walsh had expressed his concerns. Truly testified that she possessed this information prior to December 16, 1992.
Doyle Richard Glaze testified that he is the assistant personnel director with the Department of Labor. In June, 1992, Walsh conversed with Glaze about workers' compensation officers practicing law and his concerns over the situation. Thereafter, in September, 1992, Walsh discussed the matter, and Glaze agreed that the issue should be resolved. However, Glaze testified that he was unaware that Walsh intended to conduct audits of the offices.
Ramon Biggio, a federal supervisor with the Job Training Partnership Act (JTPA) section of the Department of Labor, was a member of the audit team which conducted the December 17, 1992, search of Varnado's office. According to Biggio, on the afternoon of December 16, 1992, he was advised to meet with Walsh the following morning. At approximately 8:15 a.m. on December 17, 1992, Walsh advised Biggio that he would be *1030 a member of the audit team, which consisted of Biggio, Griswold, and Jane Davidson. Biggio had other plans for the day, so he was somewhat surprised at the shortness of the notice of his participation on the team. The audit team arrived at the Franklinton office at approximately 9:00 a.m. Upon arriving, they were advised that Varnado was ill that day. After presenting the memorandum from Truly to the clerical worker in the front office, Biggio and Griswold began the search of Varnado's office. The search took approximately one and one-half hours. The audit team looked into the filing cabinets and boxes, locating various personal business files. According to Biggio, nothing was marked "private." He observed various files which were not related to workers' compensation. He also observed certain pieces of equipment which did not have state identifying marks on them.
Jane Davidson, an employee of the labor department in December, 1992, testified that she was also a member of one of the audit teams. Davidson noted that, on the afternoon prior to the audit, Walsh requested that she report to his office the following day. The following morning, she was instructed to accompany Griswold and Biggio to Franklinton to copy the data files from the state computers. Davidson copied the file directories from the computers onto diskettes and later printed all of the names of the files. In addition to the file names, the list sets forth the last time the file was updated. However, Davidson could not verify the dates and times on the computers. She then prepared a report for Walsh.
Rachel Bertrand, a computer-related contract employee of the department of labor, testified that she worked at the Franklinton office on two occasions in November, 1992. On those occasions, she observed what appeared to be documents unrelated to workers' compensation stored on the state computers in Varnado's office and in the office of one of the clerical workers. Bertrand testified that she did not report her findings to anyone and commented that "it's not as though I found anything." Bertrand was adamant that she did not discuss this matter with Walsh.
Karl J. Flusche, the laboratory director of the Computer Crimes of America, testified as an expert in computers. Flusche testified that, based on his review of Davidson's testimony, her report, and the file listings, the dates and times of the files cannot accurately or reliably reflect the dates and times that the files were created or accessed or who accessed them. Flusche reasoned that the files fail to identify the computer system from which the files were copied and that computer dates and times are notoriously incorrect.
In the instant case, the trial court concluded that, based upon credibility determinations, the search was unreasonable at its inception. Clearly, the record supports the implication that there were no reasonable grounds to conclude that the search would reveal any employee misconduct. Although Walsh had a "gut" feeling that Varnado, among others, was maintaining a private practice outside his duties as a hearing officer because of Varnado's and Corey's reluctance to assimilate to Walsh's views, Walsh admitted that he had no information about their use of state equipment or personnel. Walsh's chief counsel, Adrienne Dupont, testified that she advised Walsh that he could not possibly believe that they would find anything as a result of the "audits." Although Gayle Truly testified that Walsh had information from Rachel Bertrand that personal files were kept on the state computers, Bertrand adamantly denied finding anything or discussing the matter with Walsh.[7] Accordingly, we cannot say that the trial court erred in finding that the search was unreasonable at its inception.
As such, the search of Varnado's and Allen's offices was violative of their Fourth Amendment rights and was, therefore, unconstitutional.

*1031 3. Consent.
Having determined that Varnado's and Allen's constitutional rights against unreasonable searches and seizures were violated, we must determine whether such rights were lost by the consent of the parties.
The right to privacy includes the right to be free of unwarranted intrusions into one's own quarters. However, such right may be lost by express or implied consent. Turner v. State, 494 So.2d 1292, 1297 (La.App. 2nd Cir.1986). Parties may waive even fundamental rights, including the right to be free from unreasonable searches and seizures. Carter v. Sea Land Services, Inc., 816 F.2d 1018, 1021 (5th Cir.1987).
In the instant case, implicit in the trial court's finding that the search was unconstitutional is a determination that Varnado and Allen did not consent to the search of their offices.
Melissa Barber, a legal secretary with the Workers' Compensation Office during Varnado's tenure, testified that she was working at the Franklinton office on December 17, 1992. At approximately 10:00 a.m., Griswold and two other persons arrived at the office and handed her a memorandum to give to Varnado. Griswold advised that they were there to audit the office. Griswold then went to the back of the office. The lady accompanying Griswold requested that Barber format some diskettes for her. According to Barber, the audit team then entered Varnado's office and closed the door where they remained for approximately one and one-half hour. During that time, Barber observed the audit team looking around Varnado's belongings. Barber testified that she did not have authority to enter Varnado's desk.
At trial, Varnado testified that, on a typical morning, he would arrive at the office between 6:30 and 7:00 a.m. On the morning of the audit, Varnado did not arrive at the office until approximately 10:00 a.m. because he had been ill that morning. When he arrived on the morning of December 17, 1992, various individuals with the Workers' Compensation Office were in his office conducting the search. Griswold met him at the office door, handed him a memorandum, and advised him that they were conducting an "audit." The memorandum, which was signed by Walsh and Truly, stated that the audit team had the express authority to enter the District 6 offices and "search and examine any and all files found on the premises," copy any and all documents found within the Office," and "examine any and all computer equipment and copy any and all files found."
Varnado testified that, when presented with the memorandum, he responded "you'll just have to do what you have to do." Shortly thereafter, Varnado contacted an attorney. After consulting an attorney, Varnado prepared a note and presented it to Truly, advising her that he did not consent to any search of his offices.
Griswold testified that Varnado arrived at approximately 11:00 a.m. on the morning of the audit. At that time, Griswold spoke with Varnado and provided him with a copy of the authorization to audit use of state equipment and office space. Shortly after the audit of Varnado's office, Griswold met with counsel for Varnado at which time Varnado's counsel raised the issue of the constitutionality of the searches.
Based on the above, we cannot say that the evidence established that Varnado or Allen consented to the search of their offices.

b. First Amendment Violations.
Access to the courts is protected by the First Amendment right to petition for redress of grievances. Wilson v. Thompson, 593 F.2d 1375, 1387 (5th Cir.1979). The court has held that the law is no different where the act which allegedly gave rise to the retaliation is the filing of a grievance or a lawsuit. Rathjen v. Litchfield, 878 F.2d at 836, 842 (5th Cir.1989).
Generally, the First Amendment prohibits a government employer from taking actions which were designed to "suppress the rights of public employees [to] participat[e] in public affairs." Connick v. Myers, 461 U.S. 138, 145-46, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983); Rathjen v. Litchfield, 878 F.2d at 841. Yet, in Connick, the Court also established that the First Amendment *1032 does not prevent a government employer from taking action in response to an employee's expression that does not touch on public concern. Relying on Connick, it has been held that "the courts will not interfere with personnel decisions `when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest.'" Page v. DeLaune, 837 F.2d 233, 237 (5th Cir.1988).
Because we have determined that the trial court correctly found that the search of Varnado's and Allen's offices was unconstitutional and violative of the Fourth Amendment, we find it unnecessary to determine liability for First Amendment violations.

QUALIFIED IMMUNITY
Walsh contends that he is entitled to the qualified immunity defense. Walsh reasons that he acted reasonably and without malicious intent in attempting to enforce the laws of the state.
When government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). On the other hand, permitting damage suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. Anderson v. Creighton, 483 U.S. at 638, 107 S.Ct. at 3038; Harlow v. Fitzgerald, 457 U.S. at 818, 102 S.Ct. at 2738. The courts have generally accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. Anderson v. Creighton, 483 U.S. at 638, 107 S.Ct. at 3038; Harlow v. Fitzgerald, 457 U.S. at 814, 102 S.Ct. at 2736.
As a general rule, when an official performs a function integral to the judicial process or a traditional legislative function, the official is absolutely immune from § 1983 damage liability for acts performed in those capacities, and a qualified immunity applies to most acts of governmental officials. Moresi v. State, Department of Wildlife and Fisheries, 567 So.2d at 1084. The general rule of qualified immunity is intended to provide government officials with the ability to "reasonably anticipate when their conduct may give rise to liability for damages." Anderson v. Creighton, 483 U.S. at 646, 107 S.Ct. at 3042. Where that rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current law. Anderson v. Creighton, 483 U.S. at 646, 107 S.Ct. at 3042.
In Harlow v. Fitzgerald, 457 U.S. at 815-19, 102 S.Ct. at 2736-39, the Court established a two-part test under which a public official may claim that his conduct is protected by qualified immunity. First, the court must look to the currently applicable law and determine whether the law was clearly established at the time the action in question occurred. If the court determines that the law was clearly established at the time the action occurred, then the public official claiming immunity must show that, because of extraordinary circumstances, he neither knew nor should have known of the relevant legal standard. See Moresi v. State, Department of Wildlife and Fisheries, 567 So.2d at 1084-85; Kyle v. Civil Service Commission, 588 So.2d at 1159-60.
In Anderson v. Creighton, 483 U.S. at 639, 107 S.Ct. at 3038, the Supreme Court held that the question of whether a defendant asserting qualified immunity may be personally liable turns on the objective legal reasonableness of the defendant's actions assessed in light of clearly established law. Lewis v. Goodie, 798 F.Supp. 382, 390 (W.D.La.1992). Thus, if a defendant's conduct actually violated a plaintiff's constitutional rights, the defendant is entitled to qualified immunity only if the conduct was objectively reasonable. Pfannstiel v. City of *1033 Marion, 918 F.2d 1178, 1183 (5th Cir.1990); Lewis v. Goodie, 798 F.Supp. at 390.
Applying the principles of qualified immunity, the relevant question is whether Walsh's actions in authorizing searches of Varnado's and Allen's offices violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Stated differently, the question is whether a reasonable person could have believed that these searches were lawful, in light of clearly established law and the information Walsh possessed. See Moresi v. State, Department of Wildlife and Fisheries, 567 So.2d at 1087.
The notion that every citizen has the right to be free from unreasonable searches and seizures is a widely-recognized constitutional premise. Walsh discussed the notion of conducting "audits" of the offices under his direction with numerous individuals, including Gary Mason Love, the chief of internal security for the Labor Department. In his trial testimony, Love stated that he was unaware of any internal audit procedure for the Workers' Compensation Office. According to Love, in 1990, the legislature conducted hearings and ultimately enacted legislation relative to the authority to investigate wrongdoing at the department of labor. The enactment refers to an internal security unit headed by Love. Love testified that the procedure outlined in the legislation was not followed in the audit of Varnado's office.
However, Love acknowledged that he was not consulted until March 11, 1993, well after the audits were conducted. On that date, Walsh familiarized Love with what had transpired during the December 17, 1992, audit. According to Love, he advised Walsh that, upon receipt of allegations of wrongdoing by an employee, he would contact his supervisor to make certain it was appropriate to proceed. Then, he would have met with Walsh to discuss the allegation and the basis therefor and requested assistance from the state's attorney general.
Love testified that the Department of Labor does not have a personal computer policy and that, during his ten years of service and fifteen to twenty investigations, he has never searched an individual's desk or retrieved data from a personal computer.
After reviewing the entire record, we cannot say that a reasonable person could have believed that these searches were lawful, in light of clearly established law and the information Walsh possessed. As such, Walsh is not entitled to qualified immunity.

DAMAGES
Damage awards under § 1983 are "intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations as well." Owen v. City of Independence, Missouri, 445 U.S. 622, 651, 100 S.Ct. 1398, 1416, 63 L.Ed.2d 673 (1980); Thomas v. Frederick, 766 F.Supp. 540, 559 (W.D.La.1991). Generally, three types of damages are awardable: actual or compensatory damages, nominal damages, and punitive damages. Memphis Community School District v. Stachura, 477 U.S. 299, 306, 106 S.Ct. 2537, 2542-43, 91 L.Ed.2d 249 (1986).

A. COMPENSATORY DAMAGES.
Compensatory damages awarded pursuant to § 1983 are governed by the commonlaw tort principles. Sockwell v. Phelps, 20 F.3d 187, 192 (5th Cir.1994); Thompkins v. Belt, 828 F.2d 298, 301 (5th Cir.1987). Compensatory damages should include both special damages such as medical expenses, loss of wages, and lost future earnings as well as general damages for pain and suffering and emotional and mental distress. Memphis Community School District v. Stachura, 477 U.S. at 306, 106 S.Ct. at 2542-43, 91 L.Ed.2d 249 (1986).
In reviewing damage awards, we must review the evidence to determine whether the trial court abused its much discretion in assessing damages.

1. Varnado's Damages.
With regard to the evidence as to the damages sustained by Varnado in the instant case, Varnado testified that he began his employment as a workers' compensation hearing officer in April, 1990. At that time, he was also employed part-time as an assistant *1034 district attorney, which required him to work eight hours a month. Additionally, Varnado maintained a small private legal practice, which entailed four to five hours of work each month.
During his employment with the Workers' Compensation Office, Varnado earned a salary and annual and sick leave and participated in a retirement plan. Varnado's 1992 W-2 form revealed that he earned a salary of $46,175.75.
After his termination, Varnado was paid unemployment compensation of $181.00 weekly, but he could not recall the number of weeks during which he drew such compensation. Varnado also earned hourly wages and other wages for manual labor with a couple of construction companies. Varnado testified that, after his termination, he lost his part-time position with the district attorney's office, which paid approximately $750.00 per month. Further, since his termination, Varnado had earned only $9,000.00 in legal fees from his private legal practice. He further testified that he was unable to secure employment as an attorney because of the implications of his termination from the Workers' Compensation Office. He admitted, however, that he did not attempt to set up his own private practice, nor did he place an advertisement in the yellow pages. Moreover, Varnado admitted that he only worked construction for a few days each year in 1993 and 1994.
Varnado testified that his reputation in the community was damaged as a result of the actions taken against him by the Workers' Compensation Office. Varnado testified that the negative comments about him run the gamut from being a "crooked judge" to having his ethics and morals scrutinized.
His termination from the Workers' Compensation Office also caused Varnado embarrassment and humiliation. The situation made him embarrassed to be around his colleagues because of the rumors. Moreover, Varnado was humiliated and devastated because of his inability to support and provide for his family.
Varnado's wife, Donna, testified that Varnado was happy being a workers' compensation hearing officer. She testified that he was very dedicated to the work and had a very positive outlook for the future. Professionally, Varnado was highly respected, and she had received many compliments on the kind of job Varnado was performing.
Donna testified that the events of December 17, 1992, were very devastating to Varnado. Varnado telephoned her from the office around noon and told her that the state had searched through all of his personal belongings. Donna stated that Varnado felt as though his rights had been violated and that he found it humiliating and embarrassing to have people rummage through his personal belongings. In fact, Donna noted that there was a lot of pain involved in the process. Donna explained that Varnado had worked very hard to attain the position of hearing officer, which he felt was very prestigious, and his termination from such a position was humiliating.
According to Donna, the termination was very hard on the Varnados as a family. Prior to that time, Varnado had direction, and they had made plans for the future. Such plans ended with the termination. Varnado worries constantly about not being able to provide for his family. Following the termination, Varnado had to deplete their savings and retirement funds; he also sold some of their assets to pay bills. The health insurance also lapsed.
Following his termination, Varnado looked for employment, but there were no positions available in the small community in which they reside. In order to make ends meet, Donna had a nursery school in their home, and they have had to borrow money from family members. Donna and Varnado found it very embarrassing to have to borrow money from their parents.
Varnado's mother, Ms. Barbara Varnado, testified that she saw her son and his family several times each week while he was employed as a hearing officer. According to Ms. Barbara, her son was very happy serving in that capacity. Ms. Barbara described her son as a hard worker who had pride in his work. In describing Varnado's reputation prior to his termination, Ms. Barbara testified that Varnado had an excellent reputation. *1035 However, his reputation was damaged as a result of the search and termination.
Ms. Barbara further testified that the termination devastated her son. Varnado was very upset and had concerns about his ability to support his family; he was under a lot of stress. Ms. Barbara explained that Varnado had no regular income after his termination, except for his unemployment and a small amount of income from his private practice. He was unable to set up a private legal practice because of the lack of funds. Prior to the termination, Varnado never had to borrow money from his parents, however, since the termination, Ms. Barbara has had to lend Varnado money to provide for his and his family's needs. Moreover, Ms. Barbara noted that Varnado had to sell personal belongings to make ends meet. Ms. Barbara also stated that Varnado is hesitant about large gatherings of people because of the embarrassment and humiliation he feels and was very reticent about attending his 20th high school class reunion.
Richard W. Watts, a Franklinton attorney, testified that he has known Varnado since 1984 or 1985. With regard to Varnado's reputation in the community, Watts testified that Varnado had a reputation as an honest, good, and solid attorney. Watts testified that the termination from the Workers' Compensation Office caused Varnado to "drop off the professional radar screen." Watts acknowledged that rumors abounded as to whether Varnado's termination was caused by improper function of the office or some other impropriety. Watts admitted that it would be difficult for Varnado to return to the practice of law in the area. Although Watts had offered Varnado office space, Watts testified that he would be reluctant to enter into a partnership with Varnado until certain unanswered questions regarding Varnado's termination had been resolved.
Pete Lewis, a New Orleans attorney who practices in the workers' compensation area primarily, testified that he appeared numerous times before Varnado. According to Lewis, Varnado had an excellent reputation as a workers' compensation hearing officer. In fact, Lewis believed that Varnado was one of the better workers' compensation hearing officers. Lewis testified that Varnado's termination was widely known by members of the workers' compensation bar. Lewis testified that, before he would consider hiring Varnado, he would require that questions about improprieties arising from Varnado's termination be resolved.
After hearing all of the evidence, the trial court awarded Varnado damages of $90,000.00. In reviewing this damage award under the appropriate standard, we cannot say that the trial court abused its discretion in making this damage award. The record reveals that Varnado suffered lost wages. In addition, the evidence showed that Varnado sustained damages for pain and suffering and emotional and mental distress as a result of the unconstitutional search and his subsequent dismissal.

2. Allen's Damages.
With regard to her loss, Allen testified that her wages from the Workers' Compensation Office in 1992 were $16,277.93. After her termination in early 1993, Allen received unemployment compensation of $161.60 per week. The 1099-G form Allen received revealed that she earned unemployment compensation of $1,920.00 in 1993.
In June, 1993, Allen obtained employment with an accounting firm, earning approximately $500.00 less than she had earned with the Workers' Compensation Office. Allen's current position does not offer participation in a retirement plan, nor does she earn any leave time until she has been employed for one year. Allen testified that the search and termination by the Workers' Compensation Office was very humiliating. According to Allen, she is a native of Franklinton, and the talk in the community after the terminations made her feel very bad.
After hearing all of the evidence, the trial court awarded Allen damages of $60,000.00. In reviewing this damage award under the appropriate standard, we find that, although the award is generous, it does not constitute an abuse of the trial court's much discretion. The record reveals that Allen suffered some loss of wages. In addition, the evidence showed that Allen sustained damages for *1036 pain and suffering and emotional and mental distress as a result of the unconstitutional search and her subsequent dismissal.

B. PUNITIVE DAMAGES.
Punitive damages are allowed in appropriate cases under 42 U.S.C. § 1983. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 267-68, 101 S.Ct. 2748, 2760, 69 L.Ed.2d 616 (1981); McCulloch v. Glasgow, 620 F.2d 47 (5th Cir.1980); Hall v. St. Helena Parish Sheriff's Department, 668 F.Supp. 535, 540 (M.D.La.1987), affirmed, 862 F.2d 872 (5th Cir.1988).
A plaintiff may recover punitive damages under § 1983 against a defendant in his individual capacity if the defendant's "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); Sockwell v. Phelps, 20 F.3d at 192; Thompkins v. Belt, 828 F.2d at 301-02; Lewis v. Goodie, 798 F.Supp. at 388. In Booze v. City of Alexandria, 94-0763 (La. 4/4/94), 637 So.2d 91, 92, the Louisiana Supreme Court overruled its prior decision in Ricard v. State, 390 So.2d 882 (La.1980), and held that punitive damages are indeed recoverable in a suit filed in a Louisiana state court, alleging a violation of 42 U.S.C. § 1983.
The object of the remedy is to punish as well as to deter the commission of similar offenses in the future. Lewis v. Goodie, 798 F.Supp. at 388. Stated another way, the purpose of granting punitive damages under § 1983 is to deter future egregious conduct that violates constitutional rights. Thompkins v. Belt, 828 F.2d at 302.
Even when a showing is made, the trier of fact must exercise discretion, weighing the nature of the defendant's conduct, the wisdom of pecuniary punishment, and the advisability of a deterrent. Fairley v. Jones, 824 F.2d 440, 444 (5th Cir.1987).
In refusing to award punitive damages, the trial court determined that the circumstances presented herein did not warrant the award of punitive damages. We cannot say that the trial court abused its much discretion in so doing.

C. ATTORNEY'S FEES AND EXPENSES.
The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, provides that courts may award reasonable attorney's fees to a prevailing party in a § 1983 action. Sockwell v. Phelps, 20 F.3d at 193; Cobb v. Miller, 818 F.2d 1227, 1230 (5th Cir.1987); Kirchberg v. Feenstra, 708 F.2d 991, 995 (5th Cir.1983); Watson v. Nile, 591 So.2d 1343, 1344 (La.App. 1st Cir.1991). The purpose of the statutory provision for awarding attorney's fees in civil rights cases is to ensure effective access to the judicial process for persons with such grievances. Blanchard v. Bergeron, 893 F.2d 87, 89 (5th Cir. 1990). Attorney's fees may be recovered, unless special circumstances render such an award unjust. Sockwell v. Phelps, 20 F.3d at 193; Watson v. Nile, 591 So.2d at 1344. The test for prevailing party status is whether the plaintiff prevailed on the central issue by acquiring the primary relief sought. Cobb v. Miller, 818 F.2d at 1230.
In Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974), the U.S. Fifth Circuit Court of Appeals established twelve factors which the courts should consider in determining the amount of attorney's fees to award to a prevailing party.[8] These twelve factors are considered *1037 within the framework outlined in Copper Liquor, Inc. v. Adolph Coors Company, 684 F.2d 1087 (5th Cir.1982), overruled on other grounds, in International Woodworkers of America, AFL-CIO and its Local No. 5-376 v. Champion International Corporation, 790 F.2d 1174, 1175 (5th Cir.1986) and J.T. Gibbons, Inc. v. Crawford Fitting Company, 790 F.2d 1193, 1195 (5th Cir.1986). Under Copper Liquor, the court should: (1) ascertain the nature and extent of the services supplied by the attorney; (2) value the services according to the customary fee and quality of the legal work; and (3) adjust the compensation on the basis of other Johnson factors that may be of significance.
The reasonableness of the award of attorney's fees is to be judged by the abuse of discretion standard of review. Blanchard v. Bergeron, 893 F.2d at 89; Johnson v. Georgia Highway Express, Inc., 488 F.2d at 717.
In the instant case, pursuant to 42 U.S.C. § 1988, the trial court awarded plaintiffs attorney's fees of $56,552.00. Counsel for Varnado and Allen submitted a detailed statement to substantiate the time spent in connection with his representation of plaintiffs. The statement reveals that between December 8, 1992, and July 11, 1994, 565.52 hours were dedicated to the representation of Varnado and Allen. Without detailing all of the so-called "factors" of Johnson v. Georgia Highway Express, 488 F.2d at 717, we find that the award of attorney's fees of $56,552.00, which represents approximately $100.00 per hour, while generous, does not constitute an abuse of discretion. The issues presented herein are both complex and difficult. The trial of this matter lasted four days. Prior to that time, counsel attended and participated in numerous depositions and engaged in other discovery. Moreover, the record is clear that counsel spent numerous hours researching the various avenues for liability, both state and federal, as well as the quantum issues, which required in-depth analysis of the law and the facts.
In answer to the appeal, Varnado and Allen request an increase in the amount of attorney's fees for representation on appeal. The attorney fee award made by the trial judge equaled almost 38% of the total damage award. We find that this award is ample compensation for the legal services rendered in this matter and that an award of additional attorney's fees is not warranted.
Additionally, pursuant to 42 U.S.C. § 1988, the trial court awarded expenses of $7,678.03. A plaintiff is entitled to recover all reasonable out-of-pocket expenses, including charges for photocopying, paralegal assistance, travel, and telephone charges under § 1988 fee awards because they are part of the costs normally charged to a fee-paying client. Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish School Board, 919 F.2d 374, 380 (5th Cir.1990). The record reveals that counsel for Varnado and Allen submitted an itemized list of all expenses incurred, which totaled $7,678.03. The parties do not dispute the amount of the expenses awarded, only plaintiffs' entitlement to them. However, as noted previously, § 1988 authorizes such an award. As such, we find no error in the trial court's award of expenses.

REINSTATEMENT
In their answer to the appeal, Varnado and Allen also seek reinstatement. In support of their position, Varnado and Allen concede that, under state law, the trial court properly dismissed their claims for reinstatement. However, Varnado and Allen contend that the substantive law to be applied in adjudicating § 1983 actions is federal law and that, pursuant to federal law, they are entitled to reinstatement, citing Felder v. Casey, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), and Maurello v. Department of Health and Human Resources, Office of Management and Finance, 546 So.2d 545 (La.App. 1st Cir.1989).
We note that Varnado's and Allen's reliance on Felder v. Casey, and Maurello v. Department of Health and Human Resources, *1038 Office of Management and Finance, is clearly misplaced.
LSA-Const. art. 10, § 12A grants to the Louisiana Civil Service Commission "the exclusive power and authority to hear and decide all removal and disciplinary cases." A civil service employee who is wrongfully removed from service may obtain relief from the Commission, restoring him to service with back pay. Moore v. Board of Supervisors of Louisiana State University and Mechanical College, 559 So.2d at 549-50. In Foreman v. Falgout, 503 So.2d 517, 518-19 (La.App. 1st Cir.1987), this court held that the entire thrust of the exclusive jurisdiction grant is to preclude district courts from having concurrent jurisdiction with the Civil Service Commission over classified civil service employer-employee disputes that are employment-related.
Maurello involved an appeal from a Civil Service Commission determination and does not stand for the proposition that one who is unconstitutionally discharged may be reinstated outside the framework of a civil service appeal. Moreover, although the U.S. Supreme Court, in Felder, addressed the propriety of a § 1983 action, the case dealt with the applicability of a state law on notice requirements to federal civil rights litigation. The Court, in Felder, noted that, in § 1983 litigation brought in state courts, the state and federal courts possess concurrent jurisdiction. However, the issues presented in these cases do not support plaintiffs' position that they can seek reinstatement outside the framework of the Civil Service Commission.
In the instant case, it is clear that Varnado and Allen were classified, civil service employees. The law of this state is clear that any such claims for reinstatement must be brought before the Civil Service Commission in that the Commission has exclusive jurisdiction of such matters. Therefore, we find that the trial court properly refused to reinstate Varnado and Allen.

CONCLUSION
For the above reasons, the judgment of the trial court, in favor of Varnado and Allen and against the Workers' Compensation Office, is reversed. In all other respects, the trial court judgment is affirmed. Walsh is cast for all costs on appeal.
REVERSED IN PART AND AFFIRMED IN PART.

ON REHEARING
PER CURIAM.
This matter is before the court pursuant to an application for partial rehearing and request for clarification filed by Robert Varnado, Jr. and Brenda Allen. Varnado and Allen question this court's reversal of the trial court judgment against the Workers' Compensation Office because of its liability for their damage awards under state law. Varnado and Allen contend that Walsh violated their rights under LSA-Const. Art. 1, § 5, that the Workers' Compensation Office is vicariously liable for Walsh's actions for the state constitutional violations under LSA-C.C. art. 2320, and that Walsh is not entitled to immunity under LSA-R.S. 9:2798.1. Varnado and Allen also request clarification of the judgment with regard to whether Walsh was acting within the discharge of his duties and whether their damages were the result of Walsh's wrongful acts or gross negligence such that Walsh is entitled to indemnity pursuant to LSA-R.S. 13:5108.2 F.[2]
*1039 In opposition, the Workers' Compensation Office argues that Varnado and Allen raise for the first time a challenge to the trial court's failure to find the Workers' Compensation Office liable under state law. The Workers' Compensation Office acknowledges that the state constitutional violations were raised in pleadings and argued in the trial court, and that, in determining that Walsh's actions were actionable under § 1983, the trial court did not find any tortious conduct on the part of Walsh and did not award damages for tort. The Workers' Compensation Office argues that Varnado and Allen should have raised the failure of the trial court to find actionable tort under state law or the state constitution on the appeal. The Workers' Compensation Office also argues that the trial court did not find it vicariously liable for Walsh's actions. Finally, the Workers' Compensation Office argues that, because the judgment is silent as to these items, such claims were rejected by the trial court.

STATE CONSTITUTIONAL VIOLATIONS
In their petition for damages, Varnado and Allen alleged that the search of their offices violated their United States Fourth Amendment constitutional rights and their LSA-Const. Art. 1, § 5 constitutional rights. In pre-trial memoranda, the parties addressed 42 U.S.C. § 1983 violations and Art. 1 § 5 violations. In written reasons for judgment, the trial court noted that three questions were presented: was the office unconstitutionally searched, was the search malicious, and was there qualified immunity. In responding to these inquiries, the court determined that the searches were not constitutional. The court stated that "Walsh's actions were specifically designed as retaliation for filing this lawsuit. Mr. Walsh was a person acting under color of state law and his actions deprived Mr. Varnado of one of the rights, privileges and immunities secured by the Constitution of the United States." The trial court also noted that "state officials may not take retaliatory action against an individual designed to either punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future. An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper" quoting Harrison v. Springdale Water and Sewer Com'n, 780 F.2d 1422, 1428 (8th Cir. 1986).
The trial judge did not make any specific determination relative to the state constitutional law issues, other than to find that Walsh's actions were constitutionally infirm. In the judgment, the trial court simply rendered judgment in favor of plaintiffs and against the Workers' Compensation Office and Walsh.
Generally, silence in a judgment as to relief requested is deemed a rejection, unless there has been a specific reservation. Sewell v. Argonaut Southwest Insurance Company, 362 So.2d 758, 760 (La.1978). In the instant case, the trial court determined that Walsh's searches were unconstitutional, but did not specify to whether these searches violated federal or state constitutional rights, or both. Moreover, the rendition of a verdict in favor of Varnado and Allen, without an explicit rejection of their state constitutional claims, would not have necessitated an appeal by Varnado and Allen. As the court noted in Davis v. Borskey, 94-2399 p. 6 (La. 9/5/95), 660 So.2d 17, 21 n. 6:
Appeals are taken from judgments, and not from findings on various issues in the course of the trial court's determination of the judgment. Plaintiff obtained a judgment in the trial court against both defendants in an amount satisfactory to him, and he had no reason to appeal or answer the appeal. Under the 1989 amendment to LSA-C.C. art. 2133 (which was designed to do away with useless protective appeals), *1040 plaintiff did not need to appeal or answer the appeal in order to raise any argument supported by the record in support of his judgment.
The trial court rendered judgment in favor of Varnado and Allen and against Walsh and the Workers' Compensation Office. Under the rationale of Davis, Varnado and Allen did not need to appeal the judgment in their favor to argue alternative grounds as to why the relief granted in the judgment was supported by the evidence.
Damages to an individual for injuries or loss caused by a violation of LSA-Const. Art. 1, § 5, are recoverable. Moresi v. State, Department of Wildlife and Fisheries, 567 So.2d 1081, 1093 (La.1990). The Louisiana Constitution affords a higher standard of individual liberty than the Fourth Amendment of the United States Constitution because Article 1, § 5 of the Louisiana Constitution protects citizens against an "invasion of privacy." State v. Matthews, 94-2122 p. 3 (La. App. 4th Cir. 4/26/95); 654 So.2d 868, 870; State v. Thomas, 94-42 p. 4 (La.App. 5th Cir. 5/31/94); 638 So.2d 440, 443, writ denied, 94-1695 (La. 11/17/95); 663 So.2d 718. Since 1974, the courts of this state have interpreted the right to privacy declared in Art. 1, § 5 to incorporate protection for several different categories of privacy interests. In the area of invasion of privacy by unreasonable searches and seizures, the courts have interpreted the right of privacy to afford a broader and even more stringent protection of individual liberty than the Fourth Amendment. State v. Perry, 610 So.2d 746, 755-56 (La.1992). See Holthus v. Louisiana State Racing Commission, 580 So.2d 469, 471 (La. App. 4th Cir.1991), writ denied, 584 So.2d 1162 (La.1991).
Given that the state constitutional right to privacy is broader than the federal constitutional right against unreasonable searches and seizures, in violating the more lenient protection, Walsh would also have violated the more stringent protection. In written reasons for judgment, the trial court affirmatively answered an inquiry as to whether the search of Varnado's and Allen's offices was unconstitutional. As a result, in addition to violating Varnado's and Allen's federal constitutional guarantees against unreasonable searches and seizures, Walsh also violated Varnado's and Allen's state constitutional rights against invasions of their privacy under LSA-Const. Art. 1, § 5.

VICARIOUS LIABILITY
Varnado and Allen contend that Walsh was an employee of the state within the contemplation of LSA-R.S. 42:1441.1 such that the Workers' Compensation Office is vicariously liable under LSA-C.C. art. 2320. The Workers' Compensation Office argues that, because Walsh's actions were intentional, he is not entitled to indemnification under LSA-R.S. 13:5108B [3] and, therefore, is not among the class of persons for whom vicarious liability arises based on LSA-R.S. 42:1441.1.
LSA-R.S. 42:1441.1 addresses the non-imposition of master-servant liability on the Workers' Compensation Office by LSA-C.C. art. 2320 and provides that:
Civil Code Article 2320 and other laws imposing liability on a master for the offenses and quasi offenses of his servant shall not extend or apply to and shall not impose liability on the state for the offenses and quasi offenses of any person who is not expressly specified by R.S. 13:5108.2(A) to be an official, officer, or employee of the state entitled to indemnification under R.S. 13:5108.2.
The applicable portion of LSA-R.S. 13:5108.2A(1)(a) addresses indemnification of officials, officers, and employees of the state and provides as follows, that: "[a]s used in this Section, an official, officer, or employee of the state means such a person holding office or employment [i]n the executive branch of state government or in any department, office, division, or agency thereof."
LSA-R.S. 42:1441.1 limits the effects of LSA-C.C. art. 2320 on the state to specifically enumerated individuals for whom vicarious liability is extended. The statute does not limit the state's liability for only negligent acts of its employees, but rather LSA-C.C. art. 2320 imposes vicarious liability on the *1041 state for all actions of the individuals specifically listed in LSA-R.S. 13:5108.2. Garrett v. Fleetwood, 93-2382 p. 7 (La.App. 4th Cir. 9/29/94); 644 So.2d 664, 669, writ denied, 94-3081 (La. 2/17/95); 650 So.2d 253. In Garrett v. Fleetwood, 644 So.2d at 669, our Brethren of the second circuit noted that, pursuant to LSA-R.S. 42:1441.1, the state is vicariously liable for only those individuals listed in 13:5108.2 A, regardless of whether those individuals will be indemnified by the state under LSA-R.S. 13:5108.2 B.
There is no dispute that Walsh, as an Assistant Secretary of the Labor Department and Director of the Workers' Compensation Office, is expressly specified by LSA-R.S. 13:5108.2 A(1)(a) to be an employee of the state. As such, the Workers' Compensation Office may be vicariously liable for Walsh's actions under LSA-C.C. art. 2320 and LSA-R.S. 42:1441.1.
LSA-C.C. art. 2320 addresses vicarious liability and provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." Generally, an employer is liable for a tort committed by his employee if, at the time, the employee was acting within the course and scope of his employment. Baumeister v. Plunkett, 95-2270 p. 3 (La. 5/21/96); 673 So.2d 994, 996; Orgeron v. McDonald, 93-1353 p. 4 (La. 7/5/94); 639 So.2d 224, 226. The course of employment test refers to time and place. Benoit v. Capitol Manufacturing Company, 617 So.2d 477, 479 (La.1993). For an employer to be vicariously liable for the tortious acts of its employee, the tortious conduct of the employee must be so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct instituted by purely personal considerations entirely extraneous to the employer's interest. Baumeister v. Plunkett, 673 So.2d at 996; Barto v. Franchise Enterprises, Inc., 588 So.2d 1353, 1356 (La.App. 2nd Cir.1991), writ denied, 591 So.2d 708 (La.1992).
An employer is not vicariously liable merely because his employee commits a tort on the business premises during working hours. See Tampke v. Findley Adhesives, Inc., 489 So.2d 299, 301 (La.App. 4th Cir.), writ denied, 491 So.2d 24 (La.1986); McClain v. Holmes, 460 So.2d 681, 684 (La.App. 1st Cir. 1984), writ denied, 463 So.2d 1321 (La.1985). Vicarious liability will attach only if the employee is acting within the ambit of his assigned duties and also in furtherance of his employer's objective. Baumeister v. Plunkett, 673 So.2d at 996; Scott v. Commercial Union Insurance Company, 415 So.2d 327, 329 (La.App. 2nd Cir.1982). Moreover, an employer can be vicariously liable for the intentional torts committed by its employees. Latullas v. State, 94-2049 p. 6 (La.App. 1st Cir. 6/23/95); 658 So.2d 800, 803.
In LeBrane v. Lewis, 292 So.2d 216, 218 (La.1974), the Louisiana Supreme Court considered the following factors in holding an employer liable for an employee's actions:
(1) whether the tortious act was primarily employment rooted;
(2) whether the act was reasonably incidental to the performance of the employee's duties;
(3) whether the act occurred on the employer's premises; and
(4) whether it occurred during the hours of employment.
However, this does not mean that all four of these factors must be met before liability may be found. Miller v. Keating, 349 So.2d 265, 268 (La.1977). The particular facts of each case must be analyzed to determine whether the employee's tortious conduct was within the course and scope of his employment. Scott v. Commercial Union Insurance Company, 415 So.2d at 329.
In the instant case, it is clear that Walsh was acting in the discharge of his duties as the Director of the Workers' Compensation Office at the time he instituted the search of Varnado's and Allen's offices and possessions. Although Walsh's actions were clearly intentional, there is no question that his general activities at the time of the search were done in the course and scope of his employment with the Workers' Compensation Office. As such, under the principles *1042 enunciated above, the Workers' Compensation Office is vicariously liable to Varnado and Allen, unless Walsh is entitled to the protections of an immunity.

IMMUNITY
Having determined that the Workers' Compensation Office is vicariously liable for Walsh's actions, we must determine whether Walsh is entitled to any immunity.

A. Qualified Immunity.
On original hearing, we determined that Walsh was not entitled to qualified immunity for the § 1983 violations for infringements of Varnado's and Allen's federal constitutional rights. In addressing Varnado's and Allen's claims for violations of state constitutional rights under Art. 1 § 5, we must determine whether Walsh is entitled to a qualified immunity for violations of state constitutional rights.
In Moresi v. State, Department of Wildlife and Fisheries, 567 So.2d at 1093, the Louisiana Supreme Court noted that the same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officers under § 1983 required the court to recognize a similar immunity for state officers under any action arising from the state constitution. Accordingly, the court determined that a qualified immunity is justified in an action against state officers or persons acting under color of state law for damages caused by a violation of LSA-Const. Art. 1, § 5. Consequently, a plaintiff's allegation and proof of conduct under color of state law that deprived him of a right secured by Article 1, § 5 may not always assure the plaintiff of recovery. If the defendant shows that the state constitutional right alleged to have been violated was not clearly established, the defendant is entitled to qualified immunity.
In the instant case, the trial court determined that Walsh was not entitled to the qualified immunity for § 1983 violations. In affirming this determination on original hearing, we noted that the legal protections against unreasonable searches and seizures is clearly established and that Walsh did not establish that he neither knew nor should have known about the relevant legal standard. The same is true of the state constitutional rights afforded by LSA-Const. Art. 1, § 5. Therefore, Walsh is, likewise, not entitled to qualified immunity for the state constitutional violations.

B. Discretionary Acts Immunity under LSA-R.S. 9:2798.1
The discretionary function exception or immunity is set forth in LSA-R.S. 9:2798.1 and provides as follows:
A. As used in this Section, "public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
This statute immunizes public bodies, like the Workers' Compensation Office, from liability for policy-based decisions. Rick v. State, Department of Transportation and Development, 93-1776 p. 10 (La. 1/14/94); 630 So.2d 1271, 1276. Under this statute, the Workers' Compensation Office would not liable for the discretionary acts of their officers or employees. Williams v. City of Monroe, 27,065 p. 7 (La.App. 2nd Cir. 7/3/95); 658 So.2d 820, 828, writs denied, 95-1998, 95-2017 (La. 12/15/95); 664 So.2d 451, 452. Immunity from liability for discretionary acts is essentially the same as the immunity conferred on the federal government by the exception in the Federal Tort Claims Act (FTCA). Christian v. Fontenot, 28,175 p. 10 (La.App. 2nd Cir. 4/8/96); 672 So.2d 436, 443, writ denied, 96-1385 (La. 9/13/96); 679 So.2d 105.
In Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the United States Supreme Court developed *1043 the following two-step analysis to examine immunity under FTCA: (1) whether a statute, regulation, or policy specifically prescribes a course of action; and (2) whether the challenged action is grounded in political, economic, or social policy. The Louisiana Supreme Court has adopted the Berkovitz inquiry to analyze the applicability of LSA-R.S. 9:2798.1. Simeon v. Doe, 618 So.2d 848, 852-53 (La.1993); Fowler v. Roberts, 556 So.2d 1, 15 (La.1989) (on rehearing); Christian v. Fontenot, 672 So.2d at 444. The application of this two-pronged inquiry was explained in Fowler v. Roberts, 556 So.2d at 15, as follows:
Discretion exists only when a policy judgment has been made. Judicial interference in executive actions involving public policy is restrained by the exception. Thus, the exception protects the government from liability only at the policy making or ministerial level, not at the operational level. (citations omitted.)
Therefore, in applying this analysis, first, the court must determine whether the government action is a matter of choice. If it is not (because some statute, regulation, or policy prescribes a specific course of action to follow), then the exception does not apply, and there is no immunity. On the other hand, if the action does involve an element of choice or discretion, then the court must determine whether that discretion is the kind which is shielded by the exception, that is, one grounded in social, economic, or political policy. Only those actions based on public policy are protected by the statute. Archon v. Union Pacific Railroad, 94-2728 pp. 12-13 (La. 6/30/95); 657 So.2d 987, 995, affirmed, 94-2728 (La. 7/2/96); 675 So.2d 1055. If the discretionary immunity function applies, the defendants are shielded from negligence liability. Christian v. Fontenot, 672 So.2d at 444.
However, LSA-R.S. 9:2798.1 C (2) provides that the provisions of Subsection B of LSA-R.S. 9:2798.1 are not applicable to acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct. In refusing to permit Walsh to invoke qualified immunity, the court determined that Walsh's actions were in retaliation for the institution of Varnado's and Allen's lawsuit. Under such circumstances, we cannot say that Walsh's actions were not malicious, intentional, or willful. As such, the discretionary acts immunity set forth in LSA-R.S. 9:2798.1 does not afford Walsh or the Workers' Compensation Office any protection.

CONCLUSION
For the above and foregoing reasons, the application for rehearing is granted in part and denied in part. The application for rehearing is denied as to those portions of the original opinion not in conflict with the views expressed in this per curiam opinion. That portion of the judgment of the trial court in favor of Varnado and against Walsh and Workers' Compensation Office for $90,000.00 is affirmed. That portion of the trial court judgment in favor of Allen and against Walsh and Workers' Compensation Office for $60,000.00 is affirmed. That portion of the trial court judgment in favor of Varnado and Allen and against the Workers' Compensation Office for attorney's fees in the amount of $56,552.00[4] is reversed. In all other respects, the trial court judgment is affirmed. The Workers' Compensation Office and Walsh are cast for all costs in the amount of $5,836.36.
AFFIRMED IN PART AND REVERSED IN PART.
NOTES
[1] Judge William F. Kline, Jr., is serving as judge pro tempore, by special appointment of the Louisiana Supreme Court.
[2] The temporary restraining order was subsequently continued for ten (10) additional days on December 23, 1992, on December 30, 1992, and on January 11, 1993.
[3] Edgar K. Corey was also discharged.
[4] The Workers' Compensation Office and Walsh subsequently applied for supervisory writs to this court, alleging that the trial court erred in denying their exception pleading the objection of no cause of action and in denying the motion for summary judgment. By order, dated January 13, 1994, this court, under docket number 93 CW 1073, denied defendants' writ application.
[5] Thereafter, on June 5, 1995, counsel for the Workers' Compensation Office filed an appellate brief in which all issues relative to the Workers' Compensation Office and Walsh were addressed.

On August 1, 1995, defendant, Alvin J. Walsh, died. Pursuant to a motion for compulsory substitution filed by plaintiffs with this court, on October 23, 1995, Billie Reagan Walsh, surviving spouse of Alvin J. Walsh, and Walsh's children, Adele Jane Walsh, Bonnie Jean Walsh, and Alvin J. Walsh, were summoned by this court to appear and substitute themselves for the deceased Alvin J. Walsh. When the members of the Walsh family failed to appear and substitute themselves for Alvin J. Walsh within the time constraint set forth in this court's order, on January 4, 1996, plaintiffs filed with this court a motion to appoint an attorney to represent the Walshes.
By order, dated January 10, 1996, this court transferred the motion to the trial court for appropriate action. Thereafter, by order, dated January 12, 1996, David Hamilton, attorney at law, was appointed to represent the Walshes in this appeal. Because Hamilton was unavailable for the appointment, on January 26, 1996, plaintiffs filed a supplemental motion to appoint an attorney. On January 29, 1996, Dele Adebamiji, attorney at law, was appointed to represent the Walshes in this appeal.
[6] A law clerk from the law office of Varnado's and Allen's counsel hand-delivered a certified copy of the temporary restraining order to Walsh.
[7] Moreover, the trial court noted that the audits were in retaliation for the lawsuit filed by Varnado and Corey.
[8] The twelve factors are:

(1) the time and labor required;
(2) the novelty and difficulty of the questions;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case;
(11) the nature and length of the professional relationship with the client; and
(12) awards in similar cases.
Rainey v. Jackson State College, 551 F.2d 672, 676 (5th Cir.1977); Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974).
[2] LSA-R.S. 13:5108.2 addresses the indemnification of officials, officers, and employees of the state and provides, in pertinent part, as follows:

B. It is hereby declared to be the public policy of this state that the state shall hold harmless and indemnify each official, officer, and employee of the state from any financial loss... arising out of any claim ... by reason of alleged negligence or other act by the employee... if the ... employee, at the time damages were sustained, was acting in the discharge of his duties and within the scope of his office, employment, contract, or assignment and such damages did not result from the intentional wrongful act or gross negligence of the ... employee.
C. Within five days after an ... employee is served with any summons, complaint, process, notice, demand, or pleading, he shall deliver the original or a copy thereof to the attorney general or, if he is employed by a department... which is authorized to employ its own attorney, he shall deliver same to the attorney so engaged. Failure to make the required delivery under this Section to the attorney general or the duly engaged attorney shall preclude indemnification hereunder.
In the application for rehearing, Varnado and Allen attempt to invoke Walsh's claim for indemnification. The record before us does not reveal that a request for indemnification was made by Walsh. The trial court was not presented with the issue, nor did the trial court rule on such issue. Therefore, any issue regarding indemnification is not properly before us in this application for rehearing.
[3] See Footnote 2.
[4] Attorney's fees are not awardable unless provided for by statute or contract. Graves v. Businelle Towing Corp., 95-1999 p. 8 (La.App. 1st Cir. 4/30/96); 673 So.2d 311, 316; Burns v. McDermott Incorporated, 95-0195 p. 5 (La.App. 1st Cir. 11/9/95); 665 So.2d 76, 79. Because there is no statutory authority allowing the recovery of attorney's fees for state constitutional violations, the Workers' Compensation Office is not liable for attorney's fees. However, this does not disturb the award of attorney's fees in favor of Varnado and Allen and against Walsh under 42 U.S.C. § 1988.